## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,      )
                                     )
           Plaintiff,          )
                                     )
vs.                                )        NO. CR 09-3086 RB
                                     )
CHRISTOPHER ROY CHAVEZ,      )
                                     )
                                     )
          Defendant.      )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND ORDER DENYING MOTION TO SUPPRESS

**THIS MATTER** is before the Court on Defendant's (Mr. Chavez) Motion to Suppress Physical Evidence and Statements [Doc. 28], filed on November 17, 2009. The Court held evidentiary hearings on March 30, 2010, and on April 29, 2010. Counsel submitted supplemental briefs on April 1 and 2, 2010. Having considered the submissions of counsel, evidence, relevant law, and being otherwise fully advised, I issue these findings of fact and conclusions of law and deny Mr. Chavez's motion to suppress.

### FINDINGS OF FACT

1.      The Indictment, filed on October 22, 2009, charges Mr. Chavez with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and aiding and abetting, in violation of 18 U.S.C. § 2. Mr. Chavez was arrested after his vehicle was stopped by police during the early morning hours of April 11, 2008, in Alamogordo, New Mexico.

2.      Mr. Chavez moves to suppress physical evidence and statements obtained following the stop of his vehicle. As grounds for the motion to suppress, Mr. Chavez argues that (1) the stop was not justified by reasonable suspicion, and, (2) the scope of the detention was unreasonable.

3.      At the March 30, 2010 evidentiary hearing, Alamogordo Department of Public Safety (hereinafter "ADPS") Officer David McColley and ADPS Officer Kenneth Funk testified on behalf of the United States. Victor Jaramillo and Martin Sanchez testified on behalf of Mr. Chavez. Defendant's Exhibit 1, the search warrant affidavit, and Defendant's Exhibit 2, a DVD containing video files of the stop and detention, were admitted without objection.  At the April 29, 2010, evidentiary hearing, Otero County Sheriff's Deputy Neil LaSalle testified on behalf of the United States.

4.      During the early morning hours of April 11, 2008, Officer McColley and Officer Funk patrolled the streets of Alamogordo in different police units.  Both officers were in uniform and carried weapons.

5.      At about 2:22 a.m., Officer McColley and Officer Funk were dispatched to the parking lot of the Alamogordo Wal-Mart.  The dispatcher relayed that a 911 call had been received from an individual who identified himself as a Wal-Mart employee.  The caller reported a disturbance involving a white Cadillac and a black pickup truck and a possible drunk driver in the Wal-Mart parking lot.  The caller provided the license plate number for each vehicle.  The caller indicated that the occupants of the Cadillac were causing the disturbance.

6.      Officer McColley arrived at the parking lot within three minutes of receiving the dispatch.  (Def. Ex. 2 at 3:15:22-3:17:10.)[1]  Officer McColley saw an individual standing just outside the Wal-Mart store doors, pointing in the direction of the white Cadillac and the black truck. (Def. Ex. 2 at 3:17:34.)

---

[1]  Officer McColley testified at the hearing that the time shown on the video varied from the actual time of the stop, which was approximately 2:22 a.m. The times shown on the video are approximately one hour later than the actual events.

7.      As Officer McColley turned into the parking lot traffic lane, a black truck was backing out of a parking space. (Def. Ex. 2 at 3:17:35.) Fast food wrappers littered the ground next to the parking space where the black truck had been parked. (Def. Ex. 2 at 3:17:36.) Officer McColley activated his emergency lights and the truck pulled into a nearby parking space. (Def. Ex. 2 at 3:17:38.) Officer McColley instructed the driver of the truck to "stay there" and proceeded after the Cadillac. (Def. Ex. 2 at 3:17:45.)

8.      The Cadillac was in the parking lot traffic lane and proceeding away from Officer McColley in the direction of the parking lot exit. (Def. Ex. 2 at 3:17:48.) Officer McColley caught up to the Cadillac with his emergency lights on, activated his siren, and stopped the Cadillac. (Def. Ex. 2 at 3:17:56-3:18:00.)

9.      Officer McColley made contact with the driver of the Cadillac, who provided a New Mexico identification card showing that the driver was Mr. Chavez. Officer McColley explained that there had been a report of a disturbance involving the white Cadillac and the black truck. (Def. Ex. 2 at 3:19:08.) Mr. Chavez denied causing a disturbance and stated that his passenger had been in Wal-Mart to buy a phone card and a pillow. (Def. Ex. 2 at 3:20:15.) Mr. Chavez referred to the passenger as his cousin.

10.      Upon contact, Officer McColley observed that Mr. Chavez's eyes were bloodshot and watery and he detected the odor of alcohol emanating from Mr. Chavez. Officer McColley asked Mr. Chavez whether Mr. Chavez had been drinking. Mr. Chavez denied that he had been drinking, and stated he and his passenger had been to Taco Bell. (Def. Ex. 2 at 3:19:19.) Officer McColley asked Mr. Chavez why Mr. Chavez's eyes were red and Mr. Chavez denied that his eyes were red. (Def. Ex. 2 at 3:19:28.) Mr. Chavez denied causing a disturbance and stated that his passenger had been drinking. (Def. Ex. 2 at 3:20:40.) Officer McColley noticed two knives in the

3

Cadillac and asked Mr. Chavez to place the knives on the dashboard.  (Def. Ex. 2 at 3:20:51.)

11.    Officer Funk arrived at the parking lot a few minutes after Officer McColley stopped the Cadillac.  (Def. Ex. 2 at 3:19:24.)  The individual standing near the front doors of the Wal-Mart flagged down Officer Funk.  When Officer Funk stopped, the individual identified himself as Monty Rowand, Jr., the Wal-Mart employee who made the 911 call.

12.    Mr. Rowand informed Officer Funk that Mr. Rowand had witnessed the whole incident that had precipitated the 911 call.  Mr. Rowand observed the white Cadillac pull into a parking space and the black truck pull in and park in a space immediately adjacent to the Cadillac.  As Mr. Rowand watched, a passenger alighted from the Cadillac and headed for the Wal-Mart entrance.  As the passenger proceeded into the store, the driver of the Cadillac yelled at the passenger that the passenger did not need to go shopping and they (the driver and the passenger) had things to do.

13.    Mr. Rowand recounted to Officer Funk that Mr. Rowand saw the driver of the black truck exit the truck and get into the passenger side of the Cadillac.  Mr. Rowand observed the driver of the Cadillac get out and urinate in the parking lot.  Subsequently, Mr. Rowand saw the occupants of the Cadillac throw Taco Bell wrappers and shot-sized liquor bottles into the parking lot.  Mr. Rowand surmised that the occupants of the Cadillac and the truck were intoxicated.  After speaking with Mr. Rowand, Officer Funk drove his police unit over to where officer McColley had stopped the Cadillac, a distance of approximately 100 yards.

14.    As Officer Funk walked up to the scene of the stop, Officer McColley asked Mr. Chavez to step out of the Cadillac.  (Def. Ex. 2 at 3:20:00.)  Officer McColley asked Officer Funk to make contact with the passenger of the Cadillac and identify him.  Officer Funk walked over to make contact with the passenger.  (Def. Ex. 2 at 3:20:09.)  The passenger stated that his name was

4

Victor Jaramillo.  After the warrant check came back "no such person on file," Officer Funk believed that the passenger was trying to conceal his identity.  Officer Funk was eventually able to identify the passenger as John Victor Jaramillo.[2]

15.     As soon as Mr. Chavez stepped out of the Cadillac,[3] Officer McColley asked Mr. Chavez for his license and insurance.  (Def. Ex. 2 at 3:20:05.)  Mr. Chavez stated that the Cadillac did not belong to him.  (Def. Ex. 2 at 3:20:10.)  Officer McColley again asked if Mr. Chavez had been drinking and Mr. Chavez responded that he had a couple of beers, but he was not drunk.  (Def. Ex. 2 at 3:20:31.)

16.     Mr. Chavez continued to deny causing a disturbance.  (Def. Ex. 2 at 3:20:50.)  Officer McColley explained that he had been dispatched based on a report of a disturbance involving a white Cadillac and a black truck.  (Def. Ex. 2 at 3:21:25.)  Mr. Chavez denied causing a disturbance, pointed in the direction of the black truck, and stated "there's our friend; he's right there."  (Def. Ex. 2 at 3:21:39.)

17.     Officer McColley had been trained on how to administer field sobriety tests and he had made approximately 100 arrests for driving while intoxicated.  Officer McColley conducted three field sobriety tests on Mr. Chavez.  (Def. Ex. 2 at 3:21:44-3:26:28.)  On the "horizontal gaze" test, Officer McColley observed that Mr. Chavez exhibited a lack of smooth pursuit and a slight, but present, onset of nystagmus prior to reaching a 45 degree angle.  Upon administering the "walk and turn" test, Officer McColley observed that Mr. Chavez missed several heel to toe steps, made an improper turn, and miscounted his steps when he returned back to his original position.  On the "one

---

[2] At the suppression hearing, Mr. Jaramillo gave his name as "Victor Jaramillo."

[3] The Cadillac was a two-door Eldorado model.  Mr. Chavez left the driver-side door open.

leg stand" test, Officer McColley observed that Mr. Chavez was unable to maintain balance with his arms at his sides.

18.     Based on all of his observations, Officer McColley was certain that Mr. Chavez was intoxicated.  Officer McColley performed a pat down search of Mr. Chavez and Mr. Chavez produced a Swiss army knife from his pocket.  (Def. Ex. 2 at 3:26:39-3:27:27.)  Officer McColley asked dispatch to check on the status of Mr. Chavez's driver's license.  (Def. Ex. 2 at 3:27:51.)

19.     As they were waiting for the return from dispatch, Mr. Chavez asked why the officers were not doing anything about the black truck, which had apparently left the scene.  (Def. Ex. 2 at 3:32:48.)  Mr. Chavez stated that he did not want to "tell on a friend," but he could call the "dude" in the truck and have him come back.  (Def. Ex. 2 at 3:32:57.)  Mr. Chavez appeared to become impatient and again denied causing a disturbance.  (Def. Ex. 2 at 3:33:06.)

20.     Officer McColley and Officer Funk stepped aside to confer. (Def. Ex. 2 at 3:33:33-3:33:59.) Their conversation is inaudible on the video.  (*Id*.)  Officer Funk approached Mr. Chavez and performed the "horizontal gaze" test on him.  (Def. Ex. 2 at 3:34:07-3:35:02.)  Officer Funk and Officer McColley again conferred.  (Def. Ex. 2 at 3:35:30-3:37:00.)  Officer Funk testified at the hearing that he informed Officer McColley of the information provided by Mr. Rowand.

21.     Officer McColley and Officer Funk approached Mr. Chavez.  (Def. Ex. 2 at 3:37:07.)  Officer McColley asked Mr. Chavez to identify the passenger and the response was inaudible.  (Def. Ex. 2 at 3:37:04.)  Officer McColley asked Mr. Chavez if there was any contraband in the vehicle.  (Def. Ex. 2 at 3:37:07.)  Mr. Chavez responded "no - you can look around."  (Def. Ex. 2 at 3:37:20.)

22.     Officer McColley asked Mr. Chavez for insurance and registration.  (Def. Ex. 2 at 3:37:25.)  Mr. Chavez provided Officer McColley with a signed title to the vehicle, but not a valid registration.  (Def. Ex. 2 at 3:37:31.)  Officer McColley informed Mr. Chavez that the dispatcher had

responded that the check on Mr. Chavez's identification card information had revealed that Mr.

Chavez's driver's license was expired.  (Def. Ex. 2 at 3:37:41.)  Mr. Chavez expressed surprise.  (*Id*.)

Officer McColley stated he was "very close" and a "half a second" from arresting Mr. Chavez.  (Def.

Ex. 2 at 3:37:48-3:37:55.)

23.     Mr. Chavez stated that he had borrowed the Cadillac from a friend named David

Aguirre, but the car did not belong to Mr. Aguirre.   (Def. Ex. 2 at 3:38:19;[4] 3:47:25.)  Officer

McColley asked about Manuel Renteria, the name on the title, but Mr. Chavez was unable to provide

a clear answer as to the ownership of the Cadillac.  (Def. Ex. 2 at 3:47:30.)  Officer McColley twice

asked Mr. Chavez whether Mr. Chavez had urinated in the parking lot.  (Def. Ex. 2 at 3:38:58-

3:39:30.)  Mr. Chavez twice denied urinating in the parking lot.  (*Id*.)  Officer McColley asked Mr.

Chavez whether Mr. Chavez had thrown any trash in the parking lot.  (*Id*.)  While Mr. Chavez

initially denied throwing the trash, (Def. Ex. 2 at 3:39:40-3:39:49), a few seconds later, Mr. Chavez

admitted to throwing the trash and said he was sorry.  (Def. Ex. 2 at 3:39:49-3:39:59.)

24.     Officer McColley asked Mr. Chavez to identify the passenger.  (Def. Ex. 2 at 3:40:00.)

Mr. Chavez responded that the passenger's name was "John."  (Def. Ex. 2 at 3:40:12.)  Officer

McColley asked if Mr. Chavez knew where Mr. Jaramillo lived.  Mr. Chavez said Mr. Jaramillo lived

on N. Florida Street in Alamogordo, but Mr. Chavez could not give Officer McColley an exact

location.  Mr. Chavez's agitated and nervous demeanor, as well as his mannerisms and slurred

speech, are evident on the video.

25.     Officer McColley asked Mr. Chavez the year of the Cadillac.  (Def. Ex. 2 at 3:40:40.)

Mr. Chavez responded it was a 1992.  (Def. Ex. 2 at 3:40:52.)  Officer McColley called in the VIN

---

[4] Subsequent investigation revealed that Shama Jackson had purchased the Cadillac from Manuel Renteria, who was the registered owner at the time of the stop.

and description of the Cadillac Eldorado to dispatch. (Def. Ex. 2 at 3:41:02.)

26.     Officer McColley asked Mr. Chavez if he would consent to a search of the vehicle. (Def. Ex. 2 at 3:42:27.) Mr. Chavez refused on the grounds that the Cadillac was not his vehicle and he did not want to be responsible for it.  (Def. Ex. 2 at 3:42:30.) Officer McColley pointed out that Mr. Chavez was driving the vehicle and was therefore in control of it.  (Def. Ex. 2 at 3:42:33.) Mr. Chavez responded that the officers had already searched the Cadillac with their flashlights.  (Def. Ex. 2 at 3:42:38.)

27.     Officer McColley asked if they should call for a dog. (Def. Ex. 2 at 3:43:04.) Mr. Chavez stated "if that's what they needed to do."  (Def. Ex. 2 at 3:43:22.) Mr. Chavez appeared nervous and accused the officers of harassing him.  (Def. Ex. 2 at 3:43:35.) Officer McColley warned Mr. Chavez that he was very close to getting a DWI and reminded Mr. Chavez that his passenger had not been identified.  (Def. Ex. 2 at 3:43:48.) Mr. Chavez protested he had been cooperative and he believed he was being harassed.  (Def. Ex. 2 at 3:44:40.) Officer McColley directed Mr. Chavez to stand near the Cadillac. (Def. Ex. 2 at 3:44:47.) Mr. Chavez stood near the Cadillac with his hands up until the officers told him he could put his hands down.  (Def. Ex. 2 at 3:44:47-3:45:35.)  At all times, Officer McColley was polite, his demeanor was even-toned, and he never raised his voice.

28.     Approximately twenty-seven minutes after the stop, Officer McColley radioed dispatch to summon a drug-sniffing dog.  (Def. Ex. 2 at 3:45:00.)  As they waited for the canine, Officer McColley asked Mr. Chavez more questions about the ownership of the car, where Mr. Chavez lived, and where Mr. Chavez and Mr. Jaramillo had been that night.  (Def. Ex. 2 at 3:45:20-3:47:30.)  Mr. Chavez responded that he believed the Cadillac belonged to his friend named David Aguirre, who lived in El Paso.  Mr. Chavez lived in Tularosa. Mr. Chavez and Mr. Jaramillo had been

8

at the Palm Side Lounge.  *Id.*  Mr. Chavez stated that he drank two Tecate beers at the Palm Side and he did not drink anything after leaving the bar.  (Def. Ex. 2 at 3:47:50.)

29.     Mr. Chavez debated the results of the sobriety tests with Officer McColley and again denied causing a disturbance.  (Def. Ex. 2 at 3:49:20.)  Officer McColley asked about the driver of the black truck, who had taken off.  (Def. Ex. 2 at 3:50:20.)  Mr. Chavez stated that he believed the driver's name was "Book."  (Def. Ex. 2 at 3:50:20-3:51-30.)  Mr. Chavez elaborated that he and Book had been peacefully eating tacos while Mr. Jaramillo was shopping inside Wal-Mart.  (*Id.*)

30.     About eight minutes after he requested the canine, Officer McColley radioed to check on the status of his request. (Def. Ex. 2 at 3:52:59.)  While the response is inaudible, Officer McColley stated "they forgot."  (Def. Ex. 2 at 3:53:10.)  Officer McColley returned Mr. Chavez's identification by placing it on the dashboard.  (Def. Ex. 2 at 3:56:04.)  Officer McColley explained that he had stopped Mr. Chavez because he had been drinking.  (*Id.*)  Officer McColley suspected there might be more in the vehicle so he called for the dog to come check it out.  (Def. Ex. 2 at 3:56:28.)  Officer McColley indicated that if the dog did not hit "they were done," but if the dog did hit "they would have more to talk about."  (Def. Ex. 2 at 3:56:32.)  Mr. Chavez responded that he was not worried because the Cadillac was not his vehicle.  (Def. Ex. 2 at 3:56:37.)

31.     Mr. Chavez was permitted to turn off the Cadillac, which had been running.  (Def. Ex. 2 at 3:56:50.)  Officer McColley stated that he could smell the alcohol content in Mr. Chavez going up.  (Def. Ex. 2 at 3:57:06.)  Mr. Chavez again denied causing a disturbance. (Def. Ex. 2 at 3:57:21.) Mr. Chavez explained he did not know that Mr. Jaramillo was his cousin until about four years before that night.  (Def. Ex. 2 at 3:57:54.)

32.     About forty-two minutes after the stop, Officer McColley called his supervisor, "Sarge," on a cell phone inside the police unit.  (Def. Ex. 2 at 4:00:10-4:03:35.)  Officer McColley

explained the suspicious circumstances and stated that he had called for the canine.  (*Id*.)  Officer McColley elaborated that he was waiting for Mr. Chavez's "content to go up" and it appeared Mr. Chavez was becoming more drunk, which was consistent with the report that Mr. Chavez had been drinking shots in the parking lot.  (*Id*.)  Only Officer McColley's side of the conversation is audible.

33.    Officer McColley asked Mr. Jaramillo to get out of the Cadillac.  (Def. Ex. 2 at 4:04:40.)  When Mr. Jaramillo got out of the car, he was speaking on a cell phone. (Def. Ex. 2 at 4:04:45.)  Officer Funk asked him to get off the phone and leave the passenger-side door open.  (Def. Ex. 2 at 4:04:52.)  Mr. Jaramillo complied.  (*Id*.)  Officer McColley explained the reasons for the investigation, stated he had called for a canine and asked if that was okay.  (Def. Ex. 2 at 4:05:12.) Mr. Jaramillo said "yes sir."  (Def. Ex. 2 at 4:05:16.)  Officer Funk performed a pat down search on Mr. Jaramillo.  (Def. Ex. 2 at 4:05:29.)

34.    Deputy LaSalle is a trained dog handler assigned to patrol duty with "Zin," a certified narcotics-detection canine.  As an aggressive-alert dog, Zin was trained to scratch and bite when he detected the odor of narcotics.  Deputy LaSalle was on duty when he received a dispatch call to assist ADPS officers who had requested a canine.  Deputy LaSalle was advised to proceed to the Wal-Mart parking lot.

35.    Deputy LaSalle and canine Zin arrived on the scene approximately forty-nine minutes after initiation of the stop, and twenty-two minutes after Officer McColley had called dispatch to request them.  (Def. Ex. 2 at 4:07:10; Def. Ex. 1 ¶ 13.)  The ADPS officers briefed Deputy LaSalle on the situation and asked him to run the canine on the Cadillac.  Both doors to the Cadillac were open.  The trunk and the hood were closed.  The weather was cold and very windy.  The wind was blowing from the back to the front of the Cadillac.  The environmental conditions dispersed odors and made it difficult for canine Zin to detect odors emanating from inside the trunk when he was

outside the vehicle.

36.     Deputy LaSalle asked Mr. Chavez if Deputy LaSalle could search the interior of the vehicle with canine Zin.  Mr. Chavez responded that "it was okay to run the dog inside the vehicle." At that time, Mr. Chavez was "completely cooperative" with Deputy LaSalle.

37.     When Deputy LaSalle brought canine Zin near the Cadillac, the canine did not alert to the outside of the Cadillac  (Def. Ex. 2 at 4:08:51.)  Canine Zin jumped into the open passenger side door and into the backseat.  (Def. Ex. 2 at 4:08:53.) Deputy LaSalle took the dog out of the car around the front of the Cadillac to the driver's-side door where he stuck his head in and then jumped in the backseat. (Def. Ex. 2 at 4:09:19.)  The dog alerted to a seam in the backseat of the Cadillac and remained there, barking for over a minute.  (Def. Ex. 1 ¶ 13; Def. Ex. 2 at 4:09:20-4:10:49.)  Deputy LaSalle pulled canine Zin out of the car and showed the dog his training toy.  (Def. Ex. 2 at 4:12:28;4:12:45.)  For a second time, Deputy LaSalle gave canine Zin the command to find odors. Canine Zin hopped into the Cadillac's backseat and alerted to the same seam area of the backseat.

38.     After the second alert, Deputy LaSalle placed Zin in his patrol unit and then spoke to Mr. Chavez near the Cadillac.  (Def. Ex. 2 at 4:13:40.)  Deputy LaSalle showed Mr. Chavez the exact location where Zin alerted and asked to search the backseat.  Mr. Chavez said "it was fine" for Deputy LaSalle to search the interior of the vehicle.  (Def. Ex. 1 ¶ 13.)  Mr. Chavez stood nearby and watched as Deputy LaSalle searched the interior of the Cadillac.  (Def. Ex. 2 at 4:14:30-4:18:13.)

39.     Deputy LaSalle thoroughly searched the interior of the Cadillac and found no contraband.  He did notice that the interior of the Cadillac was very clean and had a red leather interior.  Deputy LaSalle asked Mr. Chavez for consent to search the trunk.  Mr. Chavez became very irate and refused to consent to search the trunk.  When Officer McColley observed Mr. Chavez become increasingly hostile and argumentative toward Deputy LaSalle, Officer McColley placed Mr.

11

Chavez under arrest for driving while intoxicated.  (Def. Ex. 1 ¶ 16.)

40.     After Mr. Chavez was arrested, ADPS Officer Singer drove the Cadillac to the ADPS station and secured it inside a bay with a controlled environment.  (Def. Ex. 1 ¶ 17.)  At about 6:00 a.m. on April 11, 2008, Deputy LaSalle arrived at ADPS and conducted another exterior search of the Cadillac.  (Def. Ex. 1 ¶ 18.)  In the controlled environment, without the wind and the cold, canine Zin alerted to the trunk of the Cadillac.  (*Id.*)

41.     ADPS officers obtained a warrant to search the Cadillac at 2:27 p.m. on April 11, 2008.  (Def. Ex. 1.)  During the ensuing search, ADPS officers found, in the trunk of the Cadillac, a blue backpack containing about .3 of a pound of cocaine and slightly less than .3 of a pound of marijuana.

42.     Defense witness Victor Jaramillo testified that, at the time of the suppression hearing, he was jailed at the Otero County Detention Center on burglary charges.  On April 11, 2008, Mr. Jaramillo was the passenger in the Cadillac.  While Mr. Jaramillo had been drinking that night, to Mr. Jaramillo's knowledge, Mr. Chavez had not been drinking.  Mr. Jaramillo testified that Mr. Chavez was not drinking in the parking lot.  However, Mr. Jaramillo went inside Wal-Mart to purchase a phone card, so he was not present for the entire period that Mr. Chavez was parked next to the black truck.

43.     Mr. Jaramillo and Mr. Chavez had been at the Palm Side Lounge from about 10:00 p.m. on the evening of April 10, 2008, until about 2:00 a.m. on April 11, 2008, when the bar closed. During the four hours they spent at the Palm Side, Mr. Jaramillo drank about three shots of Patron tequila.  Mr. Jaramillo did not see Mr. Chavez drink anything at the bar.  However, Mr. Jaramillo was "too busy talking to girls and walking around shaking people's hands" to notice what Mr. Chavez was doing.  It was also dark in the bar, Mr. Jaramillo was not wearing glasses, and Mr. Jaramillo was

unable to see without his glasses.  There were about 100 to 150 people in the bar that night. Therefore, Mr. Jaramillo did not, and could not, observe whether Mr. Chavez drank any alcohol at the Palm Side.

44.     After they left the Palm Side, Mr. Chavez drove to Taco Bell where Mr. Chavez and Mr. Jaramillo purchased some food.  They then proceeded to Wal-Mart so that Mr. Jaramillo could buy a phone card.  Mr. Jaramillo testified that Mr. Chavez did not yell at Mr. Jaramillo in the Wal-Mart parking lot.  Mr. Jaramillo recognized the people in the black truck as acquaintances.  Mr. Jaramillo told them "what's up and that's it."  Mr. Jaramillo testified that Mr. Chavez and Mr. Jaramillo did not drink alcohol in the Wal-Mart parking lot.  As far as Mr. Jaramillo knew, Mr. Chavez and Mr. Jaramillo did not have any alcohol in their possession in the Wal-Mart parking lot.

45.     Defense witness Martin Sanchez testified that he is a cousin to Mr. Chavez and he and Mr. Chavez grew up together.[5]  At the time of the hearing, he was jailed at the Otero County Detention Center on a charge of contributing to the delinquency of a minor.  Mr. Sanchez expected to be released on April 2, 2010.

46.     On the night of April 10-11, 2008, Mr. Sanchez decided to stay at his grandfather's house because his grandfather was ill.  Mr. Sanchez's grandfather is a retired fire fighter who likes to listen to the police scanner and always keeps his police scanner turned on.  The police scanner picks up transmissions of the ADPS.  The police scanner does not pick up cell phone conversations.

---

[5] At the suppression hearing, the United States raised a hearsay objection to the testimony of Mr. Sanchez, which was overruled.  The United States asserted that the Federal Rules of Evidence apply at suppression hearings. Defense counsel maintained that the Federal Rules of Evidence do not apply at suppression hearings.  Defense counsel was correct.  "It is well established that, apart from questions of privilege, the Federal Rules of Evidence do not apply in suppression hearings." *United States v. Jackson*, 213 F.3d 1269, 1299 (10th Cir. 2000), *vacated on other grounds by Jackson v. United States*, 531 U.S. 1033 (2000) (vacated in light of *Apprendi*); see also Fed. R. Evid. 104(a) (stating the court is not bound by rules of evidence, except those with respect to privilege, when deciding questions of admissibility of evidence); Fed. R. Evid. 1101(d)(1) (stating rules of evidence are inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104.").

47.     At around 2:30 a.m. to 3:00 a.m. on April 11, 2008, Mr. Sanchez was watching television when he heard the ADPS officers run Mr. Chavez's name and Mr. Jaramillo's name for warrants.  When both names came back negative for warrants, the officers said they did not have anything on Mr. Chavez and Mr. Jaramillo and the officers would take them into custody for DWI and take the vehicle into temporary custody.  The officer was talking over the scanner or walkie-talkie to someone else.  Mr. Sanchez believed that he heard both sides of the conversation, but he only could remember one side.  Mr. Sanchez recalled that the officer, or officers, indicated that they pulled Mr. Chavez over for a noise disturbance and they were going to try to get him for DWI.  Mr. Sanchez did not hear anything about drugs.

48.     The Court fully credits the testimony of Officer McColley and the testimony of Officer Funk.  Neither the testimony of Mr. Jaramillo nor the testimony of Mr. Sanchez was credible.

## CONCLUSIONS OF LAW

### I.     The stop was justified at its inception.

1.     A traffic stop is an investigatory detention governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  Under *Terry*, an investigative detention is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004).  "At both stages, the reasonableness of the officer's suspicions is judged by an objective standard taking the totality of the circumstances and information available to the officers into account."  *Id*.

2.     Mr. Chavez contends that the anonymous tip was insufficient to justify the investigative stop at its inception.  "In order to conduct a lawful investigatory stop of a vehicle, the detaining officers must have, based on all the circumstances, 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' "  *United States v. Leos-Quijada*, 107

14

F.3d 786, 792 (10th Cir. 1997) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

3.      "Anonymous tips raise difficult Fourth Amendment questions. In contrast to information obtained from a known informant, an anonymous tip rarely allows authorities to assess the informant's veracity, reliability, or basis of knowledge." *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007). Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (internal quotation marks omitted).

4.      The Tenth Circuit has identified two reasons " 'why anonymous tips trouble the courts and sometimes lead to the suppression of otherwise reliable evidence.' " *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (quoting *Johnson*, 364 F.3d at 1190). The first concern relates to the motivation of the tipster, which is why the Supreme Court "has required that anonymous tips be accompanied by corroboration and other indicia of reliability." *Johnson*, 364 F.3d at 1190-91 (quotations and citation omitted). The second concern relates to the level of specificity. *Id.*, 364 F.3d at 1191. "Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens." *Id.*

5.      The inquiry is case-specific, but relevant factors include: (1) whether the informant lacked "true anonymity" (*i.e.*, whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, first-hand knowledge; (3) the informant's stated motivation for reporting the information; and (4) whether the police were able to corroborate information provided by the informant. *See United States v. Brown*, 496 F.3d 1070, 1079 (10th Cir. 2007) (considering these factors and concluding that information from an anonymous informant was sufficiently reliable to establish reasonable suspicion).

6.      Here, the caller reported that he was a Wal-Mart employee calling about a disturbance

in the Wal-Mart parking lot.  Thus, the police knew an important, identifying detail about the caller and could readily ascertain his identity.  Indeed, when Officer McColley arrived, Mr. Rowand was standing outside the front doors pointing in the direction of the Cadillac.  When Officer Funk arrived, Mr. Rowand identified himself and provided detailed information about his observations that he had reported on the 911 call.

7.     When he made the 911 call, Mr. Rowand reported contemporaneous, first-hand information.  Mr. Rowand expressed concern about a disturbance in his employer's parking lot, which explained his motivation for reporting the information to police.  The valid motivation undercuts any notion that Mr. Rowand intended to harass Mr. Chavez or fabricate the story.

8.     The information provided by Mr. Rowand to the dispatcher was corroborated by the circumstances encountered by Officer McColley and Officer Funk upon their arrival at the scene.  Notably, the caller reported a white Cadillac and black truck were involved.  Officer McColley observed a black truck and a stopped a white Cadillac.  The information provided by Mr. Rowand exhibits sufficient indicia of reliability to provide reasonable suspicion for the investigatory stop at its inception.

## II.     The scope and duration of the stop were reasonable under the circumstances.

9.     Mr. Chavez additionally argues that his continued detention without reasonable suspicion exceeded the permissible scope of the initial stop.  He contends that "there was no reasonable suspicion for the officer to change the detention from a DUI investigation into a drug investigation."  (Doc. 28 at 4.)  Mr. Chavez additionally asserts that the temporal duration of the detention was unreasonable.

10.     To satisfy *Terry's* second prong, Officer McColley's actions must have been "reasonably related in scope to the circumstances which justified the interference in the first place."

*Terry*, 392 U.S. at 20. "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003). At the same time, the officer's conduct must be assessed "through a filter of common sense and ordinary human experience." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007). "Reasonableness . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1305 (10th Cir. 2006).

11.      "As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go." *United States v. Pena-Montes*, 589 F.3d 1048, 1053 (10th Cir. 2009) (internal quotation and citation omitted). However, a traffic stop "may be expanded beyond its original purpose if, during the initial stop, the detaining officer acquires reasonable suspicion of [additional] criminal activity." *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (quotation and alteration omitted).  In this case, Officer McColley reasonably suspected additional criminal activity based on the uncertainty surrounding the ownership of the Cadillac, Mr. Chavez's reluctance to give information about Mr. Jaramillo, Mr. Chavez's lack of a driver's license, the fact that Mr. Chavez's driver's license was expired, Mr. Chavez's inconsistent answers to questions concerning the drinking and the Taco Bell trash, and the circumstances regarding the black truck.  Under the totality of the circumstances, Officer McColley was justified in extending the scope of the stop based on reasonable suspicion of criminal activity.

12.      The temporal duration of the detention also comported with the legal standards germane to reasonable suspicion.  "Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a

reasonable time to obtain a properly trained dog to sniff for contraband." *United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006). The Tenth Circuit has "held a delay of thirty-eight minutes awaiting the arrival of a canine unit, *United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997), and a 50-minute total detention while engaging in a canine search, *United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003), were both proper detentions for reasonable suspicion." *United States v. Ramirez*, 479 F.3d 1229, 1245 (10th Cir. 2007). Approximately forty-nine minutes elapsed between the stop and the dog alert. In that the Tenth Circuit has upheld similar waiting periods, the length of the detention was not unreasonable and did not violate the Fourth Amendment.

**III.   Probable cause justified the detention.**

13.   In addition to comporting with the reasonable suspicion standard, the detention was justified because there was probable cause to believe that Mr. Chavez had committed the crime of driving while intoxicated. "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (quoting *United States v. Brooks*, 438 F.3d 1231, 1241 (10th Cir. 2006)).

14.   Officer McColley encountered Mr. Chavez driving away when he arrived on the scene. Upon contact, Officer McColley detected the odor of alcohol on Mr. Chavez's breath and noticed that Mr. Chavez had bloodshot, watery eyes. Officer McColley observed that Mr. Chavez's performance on the sobriety tests indicated that he was intoxicated. These observations gave rise to probable cause to believe that Defendant had violated the law; namely, driving while intoxicated. At that point, Officer McColley knew that a crime had been committed, which gave rise to probable cause to arrest Mr. Chavez. Within nine minutes of the stop, Officer McColley had probable cause

to arrest Mr. Chavez for driving while intoxicated. (Def. Ex. 2 at 3:18:05-3:26:28.)  For this reason, the subsequent detention was supported by probable cause.

**IV.     Mr. Chavez consented to search the interior of the Cadillac.**

15.     In his motion to suppress, Mr. Chavez conceded that he consented to the canine search of the interior of the Cadillac.  (Doc. 28 ¶ 9.)  In his supplemental brief filed after the March 30, 2010 hearing,[6] Mr. Chavez asserted that no consent given fifty minutes into the detention could be voluntary.[7]  (Doc. 56 at 4.)  The issue of consent to the canine search of the interior of the vehicle was not directly addressed at the March 30, 2010 suppression hearing.  In order to address this issue, the Court reconvened the hearing *sua sponte*.  The reconvened hearing was held on April 29, 2010.

16.     The canine inspection of the exterior of the Cadillac did not require additional reasonable suspicion.  *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005).  It is well-established that law enforcement officials are free to conduct exterior canine inspections so long as the vehicle is lawfully detained.  *United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008).  "A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests."  *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005).  As discussed *supra,* the vehicle was lawfully detained.  The canine inspection of the exterior of the Cadillac was appropriate.

17.     "[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable

---

[6] At the March 30, 2010 suppression hearing, the Court approved the parties' agreement to submit supplemental briefs in lieu of closing arguments.

[7] In his supplemental briefs and at the April 29, 2010 hearing, Mr. Wright indicated he intended to argue that any consent was tainted by the unconstitutional length of the detention.  In instances when a constitutional violation precedes a search, consent is valid only if "the government [proves], from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent."  *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (quotations omitted).  This argument is inapposite because the temporal duration of the detention was reasonable and the detention was justified by probable cause.

cause to support the search." *Forbes*, 528 F.3d at 1277 (citing *United States v. Sukiz-Grado*, 22 F.3d 1006, 1009 (10th Cir. 1994)); *see also United States v. Winningham*, 140 F.3d 1328, 1330-31 (10th Cir. 1998) (officer violated the Fourth Amendment when he opened a vehicle door and allowed a drug dog to search it without first obtaining probable cause or consent).  A law enforcement officer "may not unlawfully enter an area in order to conduct a dog search."  *United States v. Ludwig*, 10 F.3d 1523, 1527 n.1 (10th Cir. 1993).  Mr. Chavez consented to a search of the interior of the Cadillac.

18.     The government bears the burden of proving the consent to search was freely and voluntarily given.  *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).  The Tenth Circuit has "developed a two-step test for determining the voluntariness of a consent to search: the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and (2) prove that this consent was given without implied or express duress or coercion." *Id.*, 89 F.3d at 719 (quotations omitted).  This is a question of fact based on the totality of the circumstances.  *Id.*; *see also Rosborough*, 366 F.3d at 1149.

19.     Deputy LaSalle asked Mr. Chavez if Deputy LaSalle could run canine Zin inside the Cadillac.  Mr. Chavez responded that "it was okay to run the dog inside the vehicle." At that time, Mr. Chavez was "completely cooperative" with Deputy LaSalle.  Subsequently, Mr. Chavez gave Deputy LaSalle consent to search the backseat and stood nearby and watched as Deputy LaSalle searched the interior of the Cadillac.  Mr. Chavez directly voiced his consent to Deputy LaSalle.  Mr. Chavez was not so intoxicated that he was unable to freely and voluntarily consent.  The officers did not coerce or intimidate Mr. Chavez.  The consent was willingly given without implied or express coercion.  When Deputy LaSalle asked Mr. Chavez for consent to search the trunk, Mr. Chavez refused.  Mr. Chavez's refusal to consent to a search of the trunk underscores that he understood that

he had the option of refusing to consent to the other two searches. The Government has satisfied its burden of proving the consent to search the interior of the vehicle was freely and voluntarily given.

**V.      The Cadillac was not searched incident to arrest.**

20.      In his supplemental briefs, Mr. Chavez asserts that the search of the trunk was invalid under *Arizona v. Gant*, 129 S.Ct. 1710 (2009). In *Gant*, the Court expressed concern that courts had generally applied its precedent, *New York v. Belton*, 453 U.S. 454 (1981), far beyond the underlying justifications for warrantless vehicle searches incident to arrest of a recent occupant, *i.e.*, officer safety and preservation of evidence. *Gant*, 129 S.Ct. at 1718-19. The Court in *Gant* held that a police officer "may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Gant*, 129 S.Ct. at 1723. As the Cadillac was not searched incident to Mr. Chavez's arrest, *Gant* is inapplicable to the facts of this case.

**THEREFORE,**

**IT IS ORDERED** that Mr. Chavez's Motion to Suppress Physical Evidence and Statements [Doc. 28], filed on November 17, 2009, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

21